# IN THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF OHIO
# WESTERN DIVISION

| | | |
|---|---|---|
| CARYL L. LUNSFORD, | : | |
| Plaintiff, | : | |
| | | Case No. 3:09cv00195 |
| vs. | : | |
| | | District Judge Walter Herbert Rice |
| MICHAEL J. ASTRUE, | : | Magistrate Judge Sharon L. Ovington |
| Commissioner of the Social | | |
| Security Administration, | : | |
| Defendant. | : | |

## REPORT AND RECOMMENDATIONS[1]

## I.   Introduction

Plaintiff Caryl L. Lunsford, a former receptionist, cashier, and factory laborer (Tr. 92), brings this case challenging the Social Security Administration's denial of her applications for Disability Insurance Benefits (DIB) and Supplemental Security Income (SSI). This Court has jurisdiction to review the administrative denial of her applications. *See* 42 U.S.C. §§405(g), 1383(c)(3).

The case is before the Court upon Plaintiff's Statement of Errors (Doc. #8), the Commissioner's Memorandum in Opposition (Doc. #12), Plaintiff's Reply (Doc. #13), the administrative record, and the record as a whole.

Throughout Plaintiff's administrative proceedings she asserted that she is eligible to receive DIB and SSI because she under a "disability" within the meaning of the Social

---

[1] Attached hereto is NOTICE to the parties regarding objections to this Report and Recommendations.

Security Act. In the present case she seeks reversal of the administrative denials of her applications and a remand for payment of benefits or, at a minimum, a remand of this case to the Social Security Administration to correct certain errors. The Commissioner seeks an Order affirming the administrative decision.

## II.    Background

### A.    Procedural History

Plaintiff protectively filed[2] DIB and SSI applications on March 2, 2004 asserting that she was under a "disability" due to cervical and lumbar degenerative disc disease each with residuals of surgeries as well as shoulder pain. *See* Tr. 21, 81. She asserted that her disability prevented her from employment beginning on October 30, 2002.

Following initial administrative denials of her applications, Administrative Law (ALJ) Judge Melvin A. Padilla held a hearing during which Plaintiff and a vocational expert testified. (Tr. 326-54). ALJ Padilla later issued a written decision concluding that Plaintiff was not under a disability. (Tr. 265-76).

Plaintiff requested further review by the Appeals Council of the Social Security Administration. The Appeals Council reviewed and vacated ALJ Padilla's decision, explaining:

> The claimant has submitted new and material evidence. The cervical MRI submitted with the request for review shows changes since the MRI of May 2005 (Exhibit 19F), including moderate cord compression at C5-C6. Further, in evaluating the treating source opinions, the Administrative Law Judge indicated that there is no evidence of any serious lumbar condition.... However, the lumbar MRI submitted with the request for review shows that there is complete loss of disc space with posterior spondolytic spurs and central disc herniation at L5-S1. Further, there was marked bilateral

---

[2] A protective filing date is the date a claimant first contacted the Social Security Administration about filing for disability benefits. It may be used to establish an earlier application date than when the Social Security Administration received the claimant's signed application. *See* http://www.ssa.gov/glossary.

> neuroforaminal compromise. Although the evidence post-dates the
> decision, it provides support to the claimant's allegations of cervical and
> lumbar dysfunction and her treating source opinions. Further development,
> to include medical expert advice, preferably from an orthopedist, and
> evaluation are needed.

(Tr. 277). On remand ALJ Padilla held a second hearing, during which three witnesses testified: Plaintiff, a vocational expert, and Dr. James Lyons (a non-treating physician). (Tr. 355-96). ALJ Padilla later issued a written decision again finding Plaintiff not under a disability. (Tr. 18-26).

ALJ Padilla's second decision ultimately became the Commissioner's final decision, subject to judicial review pursuant to 42 U.S.C. § 405(g), which Plaintiff now is due.

### B. <u>Plaintiff and Her Testimony</u>

Plaintiff was age forty-eight at the time of the ALJ's second decision. (Tr. 52). She is therefore categorized for social security purposes as a "younger person." 20 C.F.R. §§404.1563(c), 416.963(c). She attended high school education up to the twelfth grade but did not graduate and has not obtained a GED. (Tr. 344).

During the first administrative hearing, Plaintiff testified that she is unmarried and has one teenage daughter. She last worked a seasonal jobs as a receptionist from November 2001 to April 2002. When asked why she was unable to do any job, she answered:

> Okay. I had neck surgery back in '95 ... or '96.... I had three bad
> discs in my neck. And the work that I had done prior to that, I think, has
> created all my problems anyway. I did really physical labor in plastic
> factories. Anyway, I had neck surgery. And then the following year I had
> back surgery, and then another back surgery, carpal tunnel. I've got carpal
> tunnel in both my hands. My neck hurts all the time. My shoulders ache all
> the time. My neurologist said that he could do another surgery, but it would
> be like a six-hour surgery, and, you know, I could die. I don't want to die.

3

(Tr. 332). Plaintiff testified that her neck pain is ongoing and feels "just like a nagging toothache or something." *Id*. She also has pain in her lower back: "[i]t kind of feels like a pinched nerve or something...." (Tr. 334).

Plaintiff further testified that she underwent carpal tunnel surgery on her right hand and eventually developed carpal tunnel syndrome in both hands. (Tr. 335-36). She explained, "it still hurts all the time. I just have tingling in my hands a lot, and they go numb and whatever." (Tr. 336).

Plaintiff was taking Flexeril, Propocet, and Darvocet for pain and swelling relief, although she did not take all three in a single day. (Tr. 337). Flexeril causes her to become really drowsy but she has no other side effects from these medications. *Id*.

Plaintiff also had ongoing pain in both shoulders. It feels like a dull ache. (Tr. 338). She had not received any significant medical treatment for this pain. *Id*.

During the ALJ's second hearing, two years later, Plaintiff testified that she had last worked in 2002 as a cashier at a hardware store. The job lasted nine months. (Tr. 360). When asked why she thought she was disabled, Plaintiff explained that she had neck surgery in 1996 and always has pain in her neck. The pain radiates down her left arm. *Id*. She has received physical therapy three times but it did not help. (Tr. 361). Her pain medications included one or more of the following: Naproxen, Flexeril, Orphenadrin, or Tramadol. (Tr. 362). The medications help with the pain but cause her to be sleepy. She stated, "I can hardly get up." *Id*.

Plaintiff testified that she had a throbbing pain in her lower back. The pain is always there. She had previously undergone two lower back surgeries without obtaining relief. (Tr. 363).

Plaintiff noted that she cannot walk very far – only twenty to thirty minutes (she guessed). (Tr. 368). She estimated that she could stand for twenty to thirty minutes and sit for thirty minutes before needing to get up and move around. (Tr. 368-69). She feels most comfortable changing positions. (Tr. 369). She could lift only two to four pounds

4

comfortably, without hurting herself. *Id*.

When she engages in her daily activities, like cooking, sweeping, grocery shopping, making the bed, etc., her pain radiates and after doing such things for a time period, she must stop. (Tr. 374).

### C. Medical Evidence

Some highlights of the medical evidence in the administrative record is warranted. *See* Doc. #12 at 3-10, for a more detailed discussion of the medical evidence with citations to specific evidence of record.

Plaintiff's medical records document a long history of neck and back problems.

Dr. Manos reviewed Plaintiff's records in May 2004 and completed a Residual Functional Capacity form for the Ohio Bureau of Disability determinations. Based on the evidence concerning Plaintiff's cervical spine, her right shoulder tendinosis, and certain exam findings, Dr. Manos concluded that Plaintiff could perform light work.[3] ( Tr. 159-60). Four months later another physician stamped his or her agreement with Dr. Manos' opinion without providing any supporting explanation. (Tr. 163).

In May 2005 Plaintiff underwent an MRI of her cervical spine. The results showed, in part, severe disc space loss at C4-C5, C5-C6, C6-C7, and C7-T1; at C3-C4 a broad based disc protrusion/endplate osteophyte; at C4-C5 a mild broad based posterior disc protrusion and endplate osteophyte; at C6-C7 a broad based posterior disc protrusion with an endplate osteophyte associated; and at C7-T1 a broad based posterior disc protrusion/endplate osteophyte with effacement of the anterior thecal sac.[4] (Tr. 211). Each of these findings was accompanied by foraminal narrowing of varying degrees. *Id*.

---

[3] Under the Regulations, "Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds...." 20 C.F.R. §404.1567(b).

[4] The thecal sac is "a fluid filled sac that the spinal cord 'floats' within." *See* http:www.neurosurgerytoday.org/what/patient_e/tethered_syndrome.asp.

In September 2005 Plaitniff's treating physician Dr. West summarized her condition, noting that she suffered from cervical spondylosis at multiple levels; status post discectomy with fusion; and a history of two lower back surgeries. Because of this history, Dr. West did not think that Ms. Lunsford could "perform any type of employment on a regular basis." (Tr. 214).

Specifically, Dr. West indicated that Plaintiff should not lift more than ten pounds occasionally or five pounds frequently; walk/stand for more than five hours a day (one hour at a time); or sit for more than four hours a day (one hour at a time). He noted that Plaintiff should not move her head/neck side-to-side or up-down. He also noted that Plaintiff could only occasionally rotate/twist the dorsolumbar spine or use foot controls. Dr. West thought should not use her upper extremities for reaching in extension or above shoulder level; she should not use her upper extremities to push/pull; and she could only occasionally perform simple grasping or perform fine finger manipulation. (Tr. 215). Dr. West also noted several postural limitations. (Tr. 216).

Plaintiff underwent a cervical MRI in January 2007, which continued to show multilevel problems. At C4-C5 there was a central disc herniation with central stenosis and mild cord flattening; at C5-C6 there was a central disc herniation with moderate cord compression and bilateral foraminal narrowing; at C6-C7 there was a left paramedian disc herniation causing cord flattening and left greater than right foraminal stenosis. (Tr. 303).

In February 2007 Plaintiff underwent a lumbar MRI, which showed – as the Appeals Council recognized, *see* Tr. 277 – "[a]t L5-S1 there is complete loss of disc space as well as posterior spondolytic spurs and central disc herniation, which causes only minimal central canal stenosis. Due to the degenerative spurring and facet arthropathy and ligamentous hypertrophy there is marked neuroforaminal compromise." (Tr. 304). Dr. West reviewed this MRI and observed that it showed "very severe degenerative disc changes." (Tr. 313).

A non-treating orthopedic surgeon, Dr. Lyons, testified during the ALJ's second

hearing held after the Appeals Council's remand. (Tr. 290-91, 376-87). Dr. Lyons testified about his findings based on his record review. After discussing Plaintiff's multiple surgeries, Dr. Lyons testified that the imaging studies showed a considerable stenosis at C5-C5 and an EMG demonstrated radiculopathy at C7, which radiated down Plaintiff's left arm. (Tr. 378-79). The EMG also showed a carpal tunnel problem superimposed on the radiculopathy. Dr. Lyons noted Ms. Lunsford appeared to be able to function with a considerable amount of pain. (Tr. 379).

To better understand Dr. Lyons' further testimony, it is worth recalling that Listing 1.04 describes the criteria necessary to establish a disability based on a disorders of the spine or spinal cord. The Listing provides examples of such disorders such as a herniated disc (nucleus pulposus) or spinal stenosis or degenerative disc disease. Listing 1.04A then requires:

> Evidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, if there is involvement in the lower back, positive straight-leg raising test (sitting and supine)[.]

Returning to Dr. Lyons' testimony, he initially testified that Plaintiff met Listing 1.04A for her cervical spine stenosis with radiculopathy.[5] (Tr. 380). If the ALJ had fully credited this testimony and concluded that Plaintiff met Listing 1.04A, the Regulations would have required him to find Plaintiff to be under a disability. 20 C.F.R. §§404.1520(a)(4)(iii), 416.920(a)(4)(iii).

But Dr. Lyons backstepped a bit upon further questioning. When the ALJ read some of the details of Listing 1.04A, Dr. Lyons indicated that some evidence was lacking and that Plaintiff really needed further evaluation by an orthopedic surgeon. (Tr. 381).

On further questioning, Dr. Lyons confirmed that, based on MRI results, Plaintiff

---

[5] The Listings appear in the Regulations at 20 C.F.R. Part 404, Subpart P, Appendix 1.

had cervical spine stenosis, particularly at C5-C6. (Tr. 383). There was moderate cord compression at this level, which could produce pain in the arms and hands and some radiculopathy involving C7, since there was also considerable foraminal stenosis at this level. (Tr, 383-84). Dr. Lyons explained, "it's a response to pressure on her cord, or nerve roots at that level. There is considerable foraminal stenosis also, particularly at the C5-C7 level, which may be responsible for that." (Tr. 384).

Dr. Lyons further testified that a July 2005 EMG (Tr. 213) confirmed a neuroanatomical distribution of pain. (Tr. 385). According to Dr. Lyons, the record documented limitation of motion in the cervical spine although the specific degree of limitation was not as well documented. *Id*. And Dr. Lyons stated that motor loss was a not well documented as Plaintiff's grip strength, for example, had never been measured. (Tr. 385-86.

Dr. Lyons stated that although Plaintiff might not meet the Listing 1.04A, she equaled it because she not only had multi-level disc problems in the cervical spine, she also had significant problems in the lumbar spine. (Tr. 386-87).

### III. Administrative Review

#### A. "Disability" Defined

To be eligible for SSI or DIB a claimant must be under a "disability" within the definition of the Social Security Act. *See* 42 U.S.C. §§423(a), (d), 1382c(a). The definition of the term "disability" is essentially the same for both DIB and SSI. *See Bowen v. City of New York*, 476 U.S. 467, 469-70 (1986). Narrowed to its statutory meaning, a "disability" includes only physical or mental impairments that are both "medically determinable" and severe enough to prevent the applicant from (1) performing his or her past job and (2) engaging in "substantial gainful activity" that is available in the regional or national economies. *See Bowen*, 476 U.S. at 469-70.

A DIB/SSI applicant bears the ultimate burden of establishing that he or she is

under a disability. *See Key v. Callahan*, 109 F.3d 270, 274 (6th Cir. 1997); *see Wyatt v. Secretary of Health and Human Services*, 974 F.2d 680, 683 (6th Cir. 1992); *see also Hephner v. Mathews*, 574 F.2d 359, 361 (6th Cir. 1978).

### B. ALJ Padilla's Second Decision

ALJ Padilla resolved Plaintiff's disability claim by using the five-Step sequential evaluation procedure required by Social Security Regulations. *See* Tr. 18-26; *see also* 20 C.F.R. §§404.1520(a)(4), 416.920(a)(4).[6]

ALJ Padilla concluded at Step 1 of the sequential evaluation that Plaintiff had not engaged in any substantial gainful activity at any time relevant to his decision. (Tr. 21).

The ALJ found at Step 2 that Plaintiff's severe impairments included "cervical degenerative disc disease with residuals of remote surgery; lumbar degenerative disc disease with residuals of surgeries; and mild bilateral shoulder tendonitis...." (Tr. 21).

The ALJ concluded at Step 3 that Plaintiff did not have an impairment or combination of impairments that met or equaled the criteria in the Social Security Regulation's Listing of Impairments. (Tr. 21-22).

At Step 4 the ALJ found:

> [T]he claimant has the residual functional capacity to: lift up to twenty pounds occasionally and ten pounds frequently; she must have the option to alternate positions every thirty minutes; she must avoid climbing ladders, scaffolds, or working at unprotected heights; constant bending; more than frequent climbing stairs, balancing, stooping, kneeling, crouching, or crawling; overhead work; and no constant grasping and fine manipulation bilaterally. Therefore, she is limited to a reduced range of light work.

(Tr. 22) (footnote added). The ALJ also found at Step 4 that Plaintiff was able to perform her past relevant work as a receptionist. (Tr. 24). As to Plaintiff's credibility, the ALJ

---

[6] The remaining citations to the Regulations will identify the pertinent DIB Regulation with full knowledge of the corresponding SSI Regulation.

9

found, "while the claimant is credible that she has 'severe impairments', her statements concerning the intensity, duration and limiting effects of such impairments are not entirely credible." (Tr. 24).

At Step 5 the ALJ concluded that Plaintiff could perform a significant number of jobs available in the national economy. (Tr. 25).

The ALJ's findings throughout his sequential evaluation led him to ultimately conclude that Plaintiff was not under a disability and was therefore not eligible for DIB or SSI. (Tr. 21-26).

## IV. <u>Judicial Review</u>

Judicial review of an ALJ's decision proceeds along two lines: " whether the ALJ applied the correct legal standards and whether the findings of the ALJ are supported by substantial evidence." *Blakley v. Comm'r. of Social Security*, 581 F.3d 399, 406 (6th Cir. 2009); *see Bowen v. Comm'r. of Soc. Sec.*, 478 F3d 742, 745-46 (6th Cir. 2007).

Review for substantial evidence is not driven by whether the Court agrees or disagrees with the ALJ's factual findings or by whether the administrative record contains evidence contrary to those factual findings. *Rogers v. Comm'r. of Social Security*, 486 F.3d 234, 241 (6th Cir. 2007); *see Her v. Comm'r. of Soc. Sec.*, 203 F.3d 388, 389-90 (6th Cir. 1999). Instead, the ALJ's factual findings are upheld if the substantial-evidence standard is met – that is, "if a 'reasonable mind might accept the relevant evidence as adequate to support a conclusion.'" *Blakley*, 581 F.3d at 407 (quoting *Warner v. Comm'r of Social Security*, 375 F.3d 387, 390 (6th Cir. 2004). Substantial evidence consists of "more than a scintilla of evidence but less than a preponderance..." *Rogers*, 486 F.3d at 241.

The second line of judicial inquiry – reviewing for correctness the ALJ's legal criteria – may result in reversal even if the record contains substantial evidence supporting the ALJ's factual findings. *Rabbers v. Comm'r of Social Security*, 582 F.3d

647, 651 (6th Cir. 2009); *see Bowen*, 478 F3d at 746. "[E]ven if supported by substantial evidence, 'a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.'" *Rabbers*, 582 F.3d at 651 (quoting in part *Bowen*, 478 F.3d at 746 and citing *Wilson v. Comm'r. of Social Security*, 378 F.3d 541, 546-47 (6th Cir. 2004)).

## V. Discussion

Plaintiff contends that the ALJ erred at Step 3 of his sequential analysis by failing to find Plaintiff's condition equaled Listing 1.04A, as Dr. Lyons testified.

The Commissioner contends that the ALJ's reasons for rejecting Dr. Lyons' testimony were appropriate, particularly that his testimony was internally inconsistent and seemed unreliable and seemed uncertain about whether Plaintiff met Listing 1.04. The Commissioner emphasizes that Plaintiff bore the burden of proving her condition met an impairment in the Listings, and that Plaintiff was require to satisfy all the specified requirements of a particular Listing.

Plaintiff had the burden at Step 3 to establish that her impairments, alone or together, "meets or equals" an impairment in the Listings. 20 C.F.R. §404.1520(a)(4); *see Sullivan v. Zebley*, 493 U.S. 521, 529-331, 110 S.Ct. 885, 107 L.Ed.2d 967 (1990). Plaintiff focuses on the ALJ's finding that her impairments, alone or together, do not equal Listing 1.04A. To satisfy her Step 3 burden, Plaintiff could present to the ALJ evidence consisting of "'medical findings equal in severity to all the criteria for the one most similar listed impairment.'" *Foster v. Halter*, 279 F.3d 348, 355 (6th Cir. 2001)(quoting in part *Zebley*, 493 U.S. at 531).

ALJ Padilla found at Step 3 that Plaitniff's impairments, alone or together, did not meet or medically equal one in the Listings. (Tr. 21). He explained in part:

> The Medical Expert's testimony is totally rejected. He was obviously not

11

prepared. At the beginning he did not even know what exhibits he had. He kept saying there were no good updated records or that the claimant should be seen by an orthopedic surgeon. He initially said that a listing section was met but when questioned as to the specific requirements of that section (1.04A), he said that the section was not met. He appeared to change his mind on cross examination by the. [sic] His testimony was not reliable.

(Tr. 22).

The ALJ's reasons for totally rejecting Dr. Lyons' testimony that Plaintiff's cervical spine problems equaled Listing 1.04A were not supported by substantial evidence. First, while the medical expert showed some preliminary confusion over which numbered Exhibits which were in his possession at the beginning of the hearing (Tr. 376-78), he presented no confusion over the content of these Exhibits. He provided a cogent history of Plaintiff's pertinent medical conditions, and he knew the details of the various medical tests, such as MRI and EMG studies. (Tr. 378-79).

Second, contrary to the ALJ's comment, Dr. Lyons did not complain that there were "no good updated records," he simply observed that with respect to some elements in the Listing, the record was somewhat silent. *See* Tr. 381 ("We don't have some evidence that we should have to go with [the listing elements]. That's why I think she should be seen by an orthopedic surgeon down there and get that clarified"); *see also* Tr. 385 (the degree of limitation of motion and motor loss not well documented). Some of these factors were clarified in an examination report by Plaintiff's treating neurosurgeon, Dr. West. Although his examination took place on February 2, 2007, the record was apparently not available to the administrative record until after the ALJ's second hearing. The ALJ admitted only exhibits 1A through 28F during the second hearing. (Tr. 357). The updated records from Dr. West were in Exhibit 29F. (Tr. 314-15).

Dr. West's February 2007 examination showed cervical flexion was limited to 15º, extension to 10º, and rotation to 45º. (Tr. 314). Dr. West's earlier examination reports from October 2003 and July 2095 showed similar limitations in Plaintiff's range of

12

motion. (Tr. 219, 225). Dr. West's February 2007 examination also showed a slight weakness in the biceps and triceps function on the left when compared to the right. There was also a decrease in reflex on the left compared to the right. (Tr. 314). In other words, the examination that was unavailable to Dr. Lyons proved significant limitation of cervical spine motion, motor loss (weakness), and abnormal reflexes – all elements of Listing 1.04A.

Third, Dr. Lyons did not "change his mind" on cross examination as the ALJ suggested. Rather, he testified that while there was not enough evidence to document that Plaintiff's condition *met* Listing 1.04A, there was enough evidence to document that Ms. Lunsford's condition *equaled* Listing 1.04A. Specifically, Dr. Lyons explained that Plaintiff had multilevel cervical problems and significant lumbar spine problems. (Tr. 386-87). The ALJ never asked Dr. Lyons whether Plaintiff's condition equaled one in the Listings, and consequently, Dr. Lyons did not contradict his earlier did-not-meet testimony.

Fourth, the ALJ's analysis completely avoids the regulatory requirements for the evaluation of medical source opinion. The Regulations required the ALJ to evaluate Dr. Lyons' opinion under a number of factors including supportability, consistency, and specialization. *See* 20 C.F.R. §404.1527(d), (f); *see also* Social Security Ruling 96-6p 1996 WL 374180. At Step 3t he ALJ did not set forth any legal criteria for evaluating medical source opinions, did not cite this Regulation or Ruling, and did not discuss why any of these factors led him to totally reject Dr. Lyons' testimony. *See* Tr. 21-22. This constituted a failure to apply the correct legal criteria because the Regulations and Rulings required the ALJ to weigh the opinions of one-time examining physicians and record-reviewing physicians under these Regulatory factors. *See* 20 C.F.R. §404.1527(d), (f); *see also* Social Security Ruling 96-6p, 1996 WL 374180. The Regulations appear to emphasize this requirement by reiterating it no less than three times. *See* 20 C.F.R. §404.1527(d) ("we consider all of the following factors in deciding the weight to give any

13

medical opinion...."); *see also* 20 C.F.R. §404.1527(f)(ii) (factors apply to opinions of state agency consultants); 20 C.F.R. §404.1527(f)(iii) (same as to medical experts' opinions); Social Security Ruling 96-6p, 1996 WL 374180 at *2 (same).

Lastly, when considering the February 2007 lumbar spine MRI, the ALJ emphasized that it "showed only 'minimal' central canal stenosis." (Tr. 22). While the report identifies "minimal central canal stenosis" (Tr. 304), it further describes "At L5-S1 there is complete loss of disc space as well as spondolytic spurs and central disc herniation.... Due to the degenerative spurring and facet arthropathy and ligamentous hypertrophy there is marked bilateral neuroforaminal compromise." (Tr. 304). Because such findings appear to indicate the presence of an objectively documented nerve problem and because such findings require interpretation by a medical expert, the ALJ erred by overlooking or ignoring them and targeting only the information tending to support his Step 3 conclusion. This constituted error. *See Loza v. Apfel*, 219 F.3d 378, 393 (5th Cir. 2000)("ALJ must consider all the record evidence and cannot 'pick and choose' only the evidence that supports his position."); *see also Switzer v. Heckler*, 742 F.2d 382, 385-86 (7th Cir. 1984); *Kuleszo v. Barnhart*, 232 F.Supp.2d 44, 57 (S.D.N.Y. 2002).

Lastly, the ALJ noted that the minimal central canal stenosis was "supposed to be the biggest issue causing back pain (Exhibit 27F)[Tr. 304-05]." (Tr. 22). Although the ALJ cited the February 2005 MRI report, this does not suffice. As just discussed, the ALJ did not consider all the information in the report. In addition, to the extent the ALJ understood that central canal stenosis is, in general, the biggest issue causing back pain, his application of his lay understanding constituted error. *See Rosa v. Callahan*, 168 F.3d 72, 78-79 (2nd Cir. 1999) ("[T]he ALJ cannot arbitrarily substitute his own opinion for competent medical opinion"); *see also Hall v. Celebreeze*, 314 F.2d 686,690 (6th Cir. 1963) ("While the Secretary may have expertise in respect to some we to not belief he supplants the medical expert.").

Accordingly, Plaintiff's challenges to the ALJ findings at Step 3 of the sequential

14

evaluation are well taken.

### VI. Remand For Payment of Benefits

If the ALJ failed to apply the correct legal standards or his factual conclusions are not supported by substantial evidence, the Court must decide whether to remand the case for rehearing or to reverse and order an award of benefits. Under sentence four of 42 U.S.C. §405(g), the Court has authority to affirm, modify, or reverse the Commissioner's decision "with or without remanding the cause for rehearing." *Melkonyan v. Sullivan*, 501 U.S. 89, 99 (1991). Remand is appropriate if the Commissioner applied an erroneous principle of law, failed to consider certain evidence, failed to consider the combined effect of impairments, or failed to make a credibility finding. *Faucher v. Secretary of H.H.S.*, 17 F.3d 171, 176 (6th Cir. 1994).

An Order remanding for payment of benefits is only warranted "where proof of the disability is overwhelming or where the proof of disability is strong and evidence to the contrary is lacking." *Faucher*, 17 F.3d at 176.

A judicial award of benefits is warranted in the present case, because Dr. Lyons' testimony that Plaintiff equals Listing 1.04A is supported by the objective medical evidence and the opinions and records of Plaintiff's treating physicians, including, at least Dr. West. The contrary opinions of the state agency record reviewer, Dr. Manos and the physician who stamped his or her agreement on the form Dr. Manos' completed, were provided in May 2004. The record reviewers therefore had no opportunity to review the later objective evidence and other findings Dr. Lyons relied on. The opinions of these reviewers is therefore weak (at best) compared to Dr. Lyons' opinions. For these reasons, the evidence that Plaintiff's impairments equal Listing 1.04A is overwhelming or is at least strong while contrary evidence is weak. *See Faucher*, 17 F.3d at 176.

Accordingly, a remand for payment of benefits is warranted.

15

**IT IS THEREFORE RECOMMENDED THAT:**

1. The Commissioner's non-disability finding be vacated;

2. Plaintiff's case be REMANDED to the Social Security Administration under Sentence Four of 42 U.S.C. §405(g) for payment of DIB and SSI consistent with the Social Security Act; and

3. The case be terminated on the docket of this Court.


March 22, 2010                                                s/Sharon L. Ovington
                                                                                                   Sharon L. Ovington
                                                                           United States Magistrate Judge

**NOTICE REGARDING OBJECTIONS**

Pursuant to Fed. R. Civ. P. 72(b), any party may serve and file specific, written objections to the proposed findings and recommendations within fourteen days after being served with this Report and Recommendations. Pursuant to Fed. R. Civ. P. 6(d), this period is extended to seventeen days because this Report is being served by one of the methods of service listed in Fed. R. Civ. P. 5(b)(2)(C), (D), (E), or (F). Such objections shall specify the portions of the Report objected to and shall be accompanied by a memorandum of law in support of the objections. If the Report and Recommendations are based in whole or in part upon matters occurring of record at an oral hearing, the objecting party shall promptly arrange for the transcription of the record, or such portions of it as all parties may agree upon or the Magistrate Judge deems sufficient, unless the assigned District Judge otherwise directs. A party may respond to another party's objections within fourteen days after being served with a copy thereof.

Failure to make objections in accordance with this procedure may forfeit rights on appeal. *See United States v. Walters*, 638 F.2d 947 (6th Cir. 1981); *Thomas v. Arn,* 474 U.S. 140 (1985).